1

2

3

4

5

6

7

8            **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

11    JAVIER A. G.,[1]                          Case No. SACV 19-2341 PVC

12                      Plaintiff,
                                                **MEMORANDUM DECISION AND**
13          v.                                  **ORDER**

14    ANDREW M. SAUL, Commissioner of
      Social Security,
15
                      Defendant.
16

17

18          Javier A. G. ("Plaintiff") appeals from the final decision of the Commissioner of

19    Social Security ("Commissioner" or "Agency") denying his application for Disability

20    Insurance Benefits ("DIB").  The parties consented pursuant to 28 U.S.C. § 636(c) to the

21    jurisdiction of the undersigned United States Magistrate Judge.  (Dkt. Nos. 12-14).  On

22    September 11, 2020, the parties filed a Joint Stipulation outlining their respective

23    positions.  (Dkt. No. 22).  For the reasons stated below, the decision of the Commissioner

24    is REVERSED, and this case is REMANDED for further administrative proceedings

25    consistent with this decision.

26

27    ─────────────────────

28    [1] The Court partially redacts Plaintiff's name in compliance with Federal Rule of Civil
      Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court
      Administration and Case Management of the Judicial Conference of the United States.

# I.

# PROCEDURAL HISTORY

On June 9, 2016, Plaintiff filed an application for period of disability and disability insurance benefits pursuant to Title II of the Social Security Act (the "Act"), alleging a disability onset date of March 11, 2016.  (AR 85, 87, 194-210).  The Commissioner denied the application initially on August 17, 2016, (AR 23, 98-102), and upon reconsideration on October 11, 2016.  (AR 23, 108-13).  On August 14, 2018, Plaintiff, represented by counsel, appeared and testified at a hearing.  (AR 43-72).  The Administrative Law Judge ("ALJ") issued an adverse decision on October 11, 2018, (AR 23-42), finding that Plaintiff was not disabled because he is capable of performing his past relevant work and, in the alternative, because there are jobs that exist in significant numbers in the national economy that he is capable of performing.  (AR 37-38).  On October 16, 2019, the Appeals Council denied Plaintiff's request for review.  (AR 1–8).  This action followed on December 4, 2019.  (Dkt. No. 1).

# II.

# ISSUE PRESENTED

On appeal, Plaintiff raises a single issue:  whether the ALJ's residual functional capacity assessment is supported by substantial evidence.  (Joint Stip. at 4).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.

## DISCUSSION

### A.      Standard of Review

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  "[The] court may set aside the Commissioner's denial of benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *see also Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); 42 U.S.C. §§ 405(g), 1383(c)(3).  "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (internal quotation marks and citation omitted).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks and citation omitted); *accord Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  To determine whether substantial evidence supports a finding, the court must "consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion."  *Aukland*, 257 F.3d at 1035 (citation omitted).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner.  *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1998).  "Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for [the court] to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence."  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014).

1

**B.     The ALJ's Decision**

2

3         The ALJ employed the five-step sequential evaluation process and concluded that

4    Plaintiff was not disabled within the meaning of the Act.  (AR 23-42).  At step one, the

5    ALJ found that Plaintiff did not engage in substantial gainful activity from his alleged

6    onset date of March 11, 2016 through September 30, 2018, his last date insured.  (AR 25).

7    At step two, the ALJ determined that through the last date insured, Plaintiff suffered from

8    the severe impairments of obesity; bilateral plantar fasciitis; lumbar spine degenerative

9    disc disease; tendinitis of the bilateral elbows; bilateral carpal tunnel syndrome;

10   impingement syndrome of the right shoulder; and osteoarthritis of the bilateral knees.[2]

11   (AR 26).  At step three, the ALJ determined that through the date last insured, Plaintiff did

12   not have an impairment or combination of impairments that met or medically equaled the

13   severity of any of the listings enumerated in the regulations.  (AR 27).

14

15        The ALJ then assessed Plaintiff's RFC and concluded that through the date last

16   insured, he could have performed medium work[3] as defined in 20 C.F.R. § 404.1567(c),

17   with the following limitations:

18

19           [Plaintiff] can lift and carry 50 pounds occasionally and 25 pounds

20           frequently, stand and walk 6 hours in an 8-hour day, and sit 6 hours in an 8-

21           hour day; can occasionally climb ladders, ropes, scaffolds, ramps, and

22           stairs; can occasionally balance, kneel and crawl; can frequently stoop and

23           crouch; can frequently walk on uneven terrain and work at heights; can

24

25   [2] The ALJ also found that Plaintiff's chronic cervical spine sprain; warts; hyperlipidemia;
     elevated PSA; gastritis/abdominal pain; allergic rhinitis; benign prostatic hyperplasia with
26   urinary symptoms; presbyopia; left vitreous floaters; obstructive sleep apnea; umbilical
     hernia; and left shoulder condition status post arthroscopy with distal clavicle resection
27   are non-severe impairments.  (AR 26-27).

28   [3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or
     carrying of objects weight up to 25 pounds."  20 C.F.R. § 404.1567(c).

4

1    occasionally reach overhead with the bilateral arms; can frequently use feet

2    to operate foot controls; and can frequently handle and finger.

3

4    (AR 29).  At step four, the ALJ concluded that through the last date insured, Plaintiff was

5    capable of performing his past relevant work as a Mental Retardation Aide (job coach) as

6    this work did not require the performance of work-related activities precluded by the

7    claimant's residual functional capacity.  (AR 36).  Although the ALJ found that Plaintiff

8    was capable of performing his past relevant work, she found in the alternative at step five

9    that given Plaintiff's RFC, age, education, work experience, and the VE's testimony,

10   through the date last insured there were jobs that existed in significant numbers in the

11   national economy that Plaintiff could have performed, including a stores laborer and

12   insulation packer.  (AR 36-38).  Accordingly, the ALJ found that Plaintiff was not under a

13   disability as defined in the Act from March 11, 2016, the alleged onset date, through

14   September 30, 2018, the date last insured.  (AR 38).

15

16        **C.**      **Discussion**

17

18        Plaintiff contends that the ALJ's RFC assessment was not supported by substantial

19   evidence because none of the examining and non-examining physicians upon whose

20   opinions the ALJ relied considered "significant medical evidence" that Plaintiff's

21   condition severely degenerated over the relevant period.  (Jt. Stip. at 7).  Plaintiff argues

22   that this unconsidered evidence "belies the finding that [Plaintiff] can perform medium

23   work." (*Id.*).  While Plaintiff acknowledges that the ALJ referred to some of that evidence

24   in her decision, he argues that an ALJ is "'simply not qualified to interpret raw medical

25   data in functional terms.'" (*Id.* at 9) (quoting *Padilla v. Astrue*, 541 F. Supp. 2d 1102,

26   1008 (C.D. Cal. 2008) (internal quotation marks omitted)).  For the reasons stated below,

27   the Court agrees that a remand is necessary for the ALJ to obtain expert opinion on

28   whether the unconsidered imaging evidence warrants modification of Plaintiff's RFC.

5

1              **1.      Medical Opinions**

2

3          In determining Plaintiff's RFC, the ALJ gave "great weight" to the expert opinions

4    of two non-examining physicians, Dr. B. Vaghaiwalla, M.D. and Dr. H. Han, M.D., and

5    one examining physician, Dr. David H. Payne, M.D.

6

7                  ***a.      Dr. B. Vaghaiwalla, M.D. (Exh. 1A)***

8

9          On August 2, 2016, (AR 82), non-examining physician Dr. B. Vaghaiwalla, M.D.

10   conducted a review of Plaintiff's medical file and completed a Disability Determination

11   Explanation.  (AR 73-84).  Dr. Vaghaiwalla concluded that Plaintiff's primary impairment

12   was dysfunction of major joints, which he categorized as "severe."  (AR 79).  According

13   to Dr. Vaghaiwalla, Plaintiff's symptoms could reasonably be expected to produce his

14   symptoms and pain, but the objective evidence was not sufficient to substantiate

15   Plaintiff's statements about the intensity, persistence and functionally limiting effects of

16   his symptoms.  Accordingly, Dr. Vaghaiwalla found Plaintiff's complaints about the

17   severity of his condition to be only "partially credible."  (AR 79-80).

18

19         Dr. Vaghaiwalla assessed the following RFC:  can occasionally lift or carry 50

20   pounds, and frequently lift or carry 25 pounds; can stand or walk for about 6 hours in an

21   8-hour workday, and sit for the same period; and has an unlimited ability to push and/or

22   pull, apart from the aforementioned lift and carry limitations.  (AR 80).  Dr. Vaghaiwalla

23   also determined that Plaintiff can climb ramps, stairs, ladders, ropes and scaffolds

24   occasionally; balance occasionally; stoop at the waist frequently; kneel occasionally;

25   crouch frequently; and crawl frequently.  (AR 81).  Dr. Vaghaiwalla based these

26   conclusions on medical records from April and May 2016 showing that: (1) for Plaintiff's

27   cervical spine, "[c]ervical vertebral bodies are normal in height," their "alignment is

28   normal," the "heights of the disc spaces are well preserved," and no fractures or

6

1   significant degenerative changes were noted; (2) for his lumbar region, although there was

2   "moderate disk space narrowing at L5-S1 with moderate neural foramina narrowing" and

3   "[m]inimal anterior osteophyte formation at L3 and L5," the "[v]ertebral bodies are

4   normal in height and alignment," "[n]o significant degenerative changes [were] noted,"

5   and the remainder of the disc spaces were "within normal limits"; and, finally,

6   (3) Plaintiff's feet showed no acute fracture, their alignment was normal, no significant

7   joint disease was noted, and no significant soft tissue abnormality could be identified.

8   (AR 81).  Dr. Vaghaiwalla further determined that Plaintiff presented with "no significant

9   shoulder finds."  (AR 81).  Ultimately, Dr. Vaghaiwalla concluded that Plaintiff was

10   capable of engaging in "medium" maximum sustained work and was "not disabled."  (AR

11   83).

12

13                        ***b.      Dr. H. Han, M.D. (Exh. 3A)***

14

15        Approximately two months later, on October 10, 2016, (AR 94), Dr. H. Han, M.D.

16   also completed a Disability Determination Explanation.  (AR 86-96).  Dr. Han observed

17   that since Dr. Vaghaiwalla's review in August 2016, Plaintiff was diagnosed with an

18   umbilical hernia in September 2016.  (AR 87).  Like Dr. Vaghaiwalla, Dr. Han found that

19   Plaintiff suffered from a primary "severe" impairment of major joint dysfunction, and that

20   Plaintiff's statements about the intensity, persistence and functionally limiting effects of

21   his symptoms were only "partially credible."  (AR 91-92).  Dr. Han ascribed an RFC

22   identical to Dr. Vaghaiwalla's, and for the same reasons.  (AR 92-94).  Also like

23   Dr. Vaghaiwalla, Dr. Han concluded that Plaintiff was capable of performing "medium"

24   work and was not disabled.  (AR 95).

25

26

27

28

7

1            *c.*        ***Examining Consultant Dr. David H. Payne, M.D. (Exh. 8F)***

2

3        On May 9, 2018, just over a year and a half after Dr. Han's assessment, orthopedic

4 surgeon Dr. David H. Payne, M.D. conducted a consultative examination of Plaintiff.

5 (AR 1140-1153).  As part of the examination, Dr. Payne reviewed certain medical

6 records, which included "a stack of records from Kaiser Permanente," x-rays of Plaintiff's

7 feet from May 2016 that showed "no identifiable problems," "multiple ophthalmological

8 evaluations," and urology clinic records.  (AR 1148).  The records showed that Plaintiff

9 was being monitored every six months for  "slightly elevated" Prostate Antigen Specific

10 results, was pre-diabetic, had undergone four or five Ebola screenings, was receiving

11 treatment for plantar warts, and suffered from "chronic cervical spine pain, left shoulder

12 sprain/strain, internal derangement of the acromioclavicular joint,[4] lumbar spine

13 sprain/strain, moderate disc degeneration, gastritis due to medication, allergic rhinitis,

14 benign prostate hypertrophy with urinary symptoms, elevated PSA, presbyopia

15 [farsightedness] on the left and vitreous floaters, tendinitis of the bilateral elbows."  (AR

16 1148-49).  Plaintiff was currently taking the following medications:  Naproxen 500mg,[5]

17 Protonix 10mg,[6] Flomax 10mg,[7] Proscar 10 mg,[8] and Diclofenac Cream.[9]

18

---

19 [4] "The acromioclavicular, or AC, joint is a joint in the shoulder where two bones meet.
One of these bones is the collarbone, or clavicle. The second bone is actually part of the
20 shoulder blade (scapula), which is the big bone behind the shoulder that also forms part of
the shoulder joint." *See* https://www.hopkinsmedicine.org/health/conditions-and-
21 diseases/ac-joint-problems.

22 [5]  Naproxen is a nonsteroidal anti-inflammatory drug "'used to treat pain or inflammation
caused by conditions such as arthritis . . . .'" *Ramirez v. Astrue*, 2010 WL 3955833, at *3
23 n.2 (C.D. Cal. Oct. 8, 2010) (quoting Naproxen, Drug Information Online, available at
http://www.drugs.com/naproxen.html).

24

[6] Protonix is a proton pump inhibitor, or "PPI," used to block gastric acid production.
25 *Kivett v. Colvin*, 2013 WL 5969711, at *3 n.11 (C.D. Cal. Nov. 8, 2013) (citing Laura
Dean, Comparing Proton Pump Inhibitors, PubMed Health (Oct. 1, 2010), http://
26 www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004954/).

27 [7] "Flomax is used to treat the symptoms of an enlarged prostate." *Gardner v. Rajan*, 2018
WL 1702782, at *1 n.2 (E.D. N.C. Feb. 1, 2018) (citing https://www.webmd.com/drugs/2/
28 drug-4154/flomax-oral/details).

1   Based on his physical examination of Plaintiff and his review of Plaintiff's medical

2   history, Dr. Payne determined that Plaintiff can:  lift and carry up to 50 pounds

3   occasionally, and up to 20 pound frequently, (AR 1141); sit, stand and walk up to 6 hours

4   in an 8-hour workday and does not require the use of a cane, (AR 1142); handle, finger,

5   feel and push/pull with his right and left hands frequently; reach overhead with his right

6   hand frequently, but with his hand only occasionally, (AR 1143); operate foot controls

7   with his right and left foot frequently, (AR 1143); climb stairs, ramps, ladders and

8   scaffolds frequently (AR 1144); and balance, stoop, kneel, crouch and crawl frequently.

9   (AR 1144).  Dr. Payne further found that Plaintiff can tolerate exposure to all of the

10   following frequently:  unprotected heights, moving mechanical parts, operating a motor

11   vehicle, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold

12   and heat, and vibrations.  (AR 1145).  Plaintiff can also tolerate loud (heavy traffic)

13   noises.  (AR 1145).  Finally, Dr. Payne concluded that Plaintiff can shop; travel without

14   assistance; ambulate without a wheelchair, walker, canes or crutches; walk a block at a

15   reasonable pace on uneven surfaces; use standard public transportation; climb a few steps

16   at a reasonable pace with the use of a single handrail; prepare a meal and feed himself;

17   take care for his personal hygiene; and sort, handle and use paper files.  (AR 1146).

18

19   Dr. Payne reported that Plaintiff:  is "[w]ell-developed, well-nourished . . . in no

20   apparent distress"; walks at a normal gait and speed without a limp; does not present with

21   scoliosis and has a full "pain-free range of motion" in his neck, thoracolumbar spine,

22   shoulders, wrist and fingers, elbows and forearms, hip, knees, ankles; had negative results

23   in both legs on the straight leg raise test both sitting and supine; and had negative results

24   on the Neer, Hawkins, Jobe, Cross-Body, Lift-Off, O'Brien's, and Apprehension tests on

25   both his shoulders.  (AR 1150-52).  Plaintiff's upper and lower extremities tested 5/5 for

26

27   [8] Proscar is prescribed for men with a benign enlarged prostate. *See Hill v. Bowles*, 2003
WL 21448045, at *2 n.3 (N.D. Tex. June 18, 2003).

28   [9] Diclofenac cream is "applied to the skin to treat arthritis pain."  *See* https://medlineplus.
gov/druginfo/meds/a611041.html.

9

1   strength, 2+ for "deep tendon reflexes," and 2+ for pulses.  Dr. Payne diagnosed Plaintiff

2   with "[m]ultiple body part pain in the shoulders, elbows and heels with minimally positive

3   examination," plantar fasciitis, cervical spine sprain/strain, and lumbar spine sprain/strain.

4   (AR 1153).  Dr. Payne concluded:

5

6           The cervical spine and lumbar spine examinations are negative.  The

7           bilateral knee examination is negative except for a mild crepitus in the

8           knees.  Neurovascularly intact in the upper and lower extremities.  The

9           findings are not that strong.  He does have a lot of pain and discomfort

10          along with high blood pressure.  He is seen at Kaiser Permanente.  He also

11          has gas and hyperlipidemia as well as chronic back pain and epicondylitis.

12          There is no motor or sensory deficit.  There is no significant loss of the

13          range of motion.

14

15   (AR 1153).

16

17                    d.      *The ALJ's Reliance on Medical Opinions*

18

19          In determining Plaintiff's ability to work, the ALJ assigned "great weight" to the

20   2016 conclusions of the DDS medical consultants, Dr. Vaghaiwalla, (AR 80-82), and

21   Dr. Han, (AR 92-94).  (*See* AR 31).  The ALJ also assigned "great weight" to Dr. Payne's

22   orthopedic consultative examination dated May 9, 2018, (AR 1140-53).  (*See* AR 31).

23   Because Dr. Payne's RFC assessment was the most recent, and was obtained by a physical

24   examination and review of the records, it is the most probative.  *See Stone v. Heckler*, 761

25   F.2d 530, 532 (1985) ("Because Stone's condition was progressively deteriorating, the

26   most recent medical report is the most probative.").

27

28

1    The ALJ concluded:

2

3        In light of the medical evidence record as a whole, the opinions of the

4        consultative examiner and DDS medical consultants are all reasonable,

5        although they vary slightly.[10]  Overall, a finding of a full range of medium

6        is well-supported and reasonable, despite the many normal and mild

7        clinical exam findings.  There is little, if any, discussion of CTS [carpal

8        tunnel syndrome] in these opinions so I added handling/fingering

9        limitation, and I reduced overhead reaching to occasionally bilaterally to

10       accommodate his shoulder condition.

11

12   (AR 32).

13

14                **2.      Evidence of Plaintiff's Alleged Degenerative Condition**

15

16       Plaintiff specifically puts at issue four "objective tests" that he contends no

17   physician considered, even though they demonstrate "far more significant problems th[a]n

18   identified by the consultative examiner and State agency physicians."  (Jt. Stip. 17).  All

19   of these tests were conducted after Dr. Vaghaiwalla and Dr. Han completed their reviews

20   of Plaintiff's medical records in 2016 and therefore could not have informed their RFC

21   assessments.  Although all of the tests were completed before examining physician

22   Dr. Payne prepared his opinion, and were therefore presumably part of the medical files

23   presented to him in the "stack" of Kaiser Permanente records submitted for his review,

24   Dr. Payne did not specifically mention them in his summary of the records that he

25   _____

26   [10] The primary differences between the RFCs proposed by Drs. Vaghaiwalla and Han, on
     the one hand, and Dr. Payne, on the other, appear to be that Drs. Vaghaiwalla and Han
     concluded that Plaintiff could kneel, climb, and balance "occasionally," (AR 81, 93),
27   while Dr. Payne found that Plaintiff could engage in those activities "frequently."  (AR
     1153).  Dr. Payne also determined that Plaintiff could lift overhead with his left shoulder
28   "occasionally" and his right should "frequently," which Drs. Vaghaiwalla and Han did not
     address.  (*Id.*).

1    reviewed.  (AR 1148-49).  Plaintiff asserts that "the fact that no physician considered the

2    additional evidence . . . in assessing [Plaintiff's] ability to work renders their opinions

3    incomplete and not substantial evidence."  (Jt. Stip. at 9)

4

5        The tests are:

6

7        A **June 29, 2017** x-ray of the bilateral knees "consistent with end-stage

8    degenerative changes in the valgus knee,[11] [with] significant osteophytes[12] present, [and]

9    the lateral joint line narrowed compared to the medial joint line."  (AR 1471).  While there

10   was "minimal effusion"[13] in the left knee, there was no instability in either knee, and the

11   results of Lachman's[14] and posterior drawer[15] tests on both knees were negative.  (AR

12   1471).  Nonetheless, Plaintiff was counseled on "the possibility of future total knee

13   replacement."  (AR 1471).[16]

14

15   [11] "Valgus deformity (genu valgum) causes the knees to bow inward, giving a knock-
     kneed appearance and putting extra pressure on the outer (lateral) compartment of the
     knee joint."  *See* https://www.tsaog.com/connect-learn-interact/blog/2014/06/20/dr-casey-
16   taber-on-knee-malalignment-varus-vs-valgus-deformity/.

17   [12] Osteophytes, commonly known as "bone spurs," are an enlargement of the normal bony
     structure.  *See* "Bone Spurs (Osteophytes) and Back Pain," at http://www.spine-
18   health.com/conditions/arthritis/bone-spurs-osteophytes-and-back-pain.

19   [13] "Knee effusion, or water on the knee, occurs when excess fluid accumulates in or
     around the knee joint. There are many common causes for the swelling, including arthritis
20   and injury to the ligaments or meniscus (cartilage in the knee)."  *See*
     https://www.medicalnewstoday.com/articles/187908.

21
     [14] "The Lachman test is a passive accessory movement test of the knee performed to
22   identify the integrity of the anterior cruciate ligament (ACL).  The test is designed to
     assess single and sagittal plane instability."  *See*  https://physio-pedia.com/Lachman_Test.

23
     [15] The "posterior drawer test" of the knees tests "the integrity of the posterior cruciate
24   ligament (PCL)."  *See* https://www.physio-pedia.com/Posterior_Drawer_Test_(Knee).

25   [16] On July 5, 2017, Plaintiff met with his physician to further discuss his knee condition,
     including the results of the June 29, 2017 x-ray.  (AR 1488).  The physician's
26   "independent review of xray's [sic] show:  Right knee films show valgus alignment,
     moderate degenerative changes with joint space narrowing and oste[o]phyte formation
27   worse lateral compartment."  (AR 1488).  The physician discussed "conservative and
     surgical" treatment options with Plaintiff, including "use of moist heat, ice, NSAIDs
28   [nonsteroidal anti-inflammatory drugs], Physical Therapy and injections.  We also
     discussed that when the time is right and the pain is significant enough that the long term

1    A **November 14, 2017** MRI of Plaintiff's spine showing:

2

3    FINDINGS:

4    Mild Disk bulges, spondylosis[17] and facet degeneration identified.  L5-S1

5    row based 2 to 3 mm AP central and right paracentral disc protrusion.  Mild

6    impingement on the right nerve root and right lateral recess.  Mild neural

7    foramen narrowing.  L4-5 minimal disc bulge and spondylosis.  Mild

8    subarticular recess narrowing.  Right neural foramen disc bulge and

9    minimal foramen narrowing.  Subtle mild bone marrow edema in the

10   sacrum.  Bone scan may be considered if there is any suspicion of stress

11   fracture or neoplastic process.  Posterior subcutaneous dependent lumbar

12   edema -- questionable significance.  No other soft tissue mass is seen.

13   Other disk space levels are unremarkable if not discussed above.  Question

14   left kidney cyst.  Tortuous iliac arteries.

15

16   IMPRESSION:

17   Mild Disk bulges, spondylosis and facet degeneration identified.  L5-S1

18   row based 2 to 3 mm AP central and right paracentral disc protrusion.  Mild

19   impingement on the right nerve root and right lateral recess.  Mild neural

20   foramen narrowing.  L4-5 minimal disc bulge and spondylosis.  Mild

21

22   solution for this problem is a total knee replacement."  (AR 1488).  The physician
     recommended "low impact exercise," weight loss, and "lower extremity strengthening."

23   (AR 1488).

24   [17] "Cervical spondylosis is a general term for age-related wear and tear affecting the spinal
     disks in your neck.  As the disks dehydrate and shrink, signs of osteoarthritis develop,

25   including bony projections along the edges of bones (bone spurs).  Cervical spondylosis is
     very common and worsens with age.  More than 85 percent of people older than age 60

26   are affected by cervical spondylosis.  Most people experience no symptoms from these
     problems."  *See* www.mayoclinic.org.  "Lumbar spondylosis is a spine condition that

27   describes the natural deterioration of the lower spine due to age and compression. . . .
     Most patients over the age of 50 have some form of mild to progressive spondylosis in the

28   lumbar spine.  However, most cases of spondylosis do not result in any symptoms."  *See*
     www.laserspineinstitute.com.

13

subarticular recess narrowing.  Right neural foramen disc bulge and

minimal foramen narrowing.  Subtle mild bone marrow edema in the

sacrum.  Bone scan may be considered if there is any suspicion of stress

fracture or neoplastic process.

(AR 1634).[18]

A **November 28, 2017** bone scan revealing:

FINDINGS:

There is mild symmetric uptake at bilateral sacroiliac joints.  There is

uptake at the acromio clavicular joints, right greater than left.  There is also

moderate uptake at the right knee.  There is mild uptake at bilateral feet and

the right first toe.  There is otherwise normal distribution of uptake

throughout the skeleton.  No Physiologic renal and bladder accumulation is

seen.

IMPRESSION:

Nonspecific symmetric uptake at bilateral sacral iliac joints, possibly

degenerative.  Degenerative uptake at the shoulders, right knee, and feet.

(AR 1698).

And finally, a **March 15, 2018** MRI of Plaintiff's right shoulder demonstrating:

---

[18] The ALJ's review of the medical records included a reference to the November 14, 2017 MRI, noting:  "A November 14, 2017 image of the lumbar spine shows mild disk bulges, spondylosis, and fact degeneration, with mild impingement on the L5-S1 right nerve root and right lateral recess."  (AR 34).

1    FINDING:

2    Bone marrow signal intensity is unremarkable without marrow edema or

3    contusion or focal bony lesion.  There is increase [sic] proton-density signal

4    within the fibers of the supra and infraspinatus tendon[19] over the region of

5    the footplate suspect for tendinosis/inner fiber tear.  Subscapularis tendon is

6    intact.  Biceps tendon is in the biceps groove and appear [sic]

7    unremarkable.  There is moderate to severe degenerative changes of the

8    acromioclavicular joint.  There is hypertrophic changes along the inferior

9    margin of the AC joint indenting the myotendinous junction of the

10   supraspinatus tendon.  There is no evidence of labral tear.  There is no focal

11   cartilage defect.  There is no joint effusion or loose body.  There is mile

12   thickening of the inferior glenohumeral ligament.  Superior and middle

13   glenohumeral ligaments are intact.  There is fluid within the subcoracoid

14   bursa.

15

16   IMPRESSION:

17   1.      There is increase proton-density signal with the fibers of the supra

18           and infraspinatus tendon over the region of the footplate suspect for

19           tendinosis/inner fiber tear.

20   2.      There is moderate to severe degenerative changes of the

21           acromioclavicular joint.  There is hypertrophic changes along the

22           inferior margin of the AC joint indenting the myotendinous junction

23           of the supraspinatus tendon.

24   3.      There is fluid within the subcoracoid bursa.

25

26

27   [19] "A supraspinatus tear is a tear or rupture of the tendon of the supraspinatus muscle. The supraspinatus is part of the rotator cuff of the shoulder." *See*

28   https://www.physio-pedia.com/Supraspinatus_tear.

1    (AR 1738-39).[20]

2

3              **3.       Analysis**

4

5         Plaintiff argues that the ALJ's RFC is not supported by substantial evidence

6    because she gave "great weight" to incomplete opinions that did not reflect consideration

7    of his deteriorating condition.  (Jt. Stip. at 7).  The Commissioner counters that the ALJ

8    reasonably relied on the physicians' opinions and in fact discussed in her decision the

9    "objective imaging evidence in 2017 and 2018" that Plaintiff claims shows that his

10   condition deteriorated.  (*Id.* at 14).  The Commissioner further contends that even if

11   Dr. Payne did not review that evidence, it showed only mild degenerative changes, and no

12   doctor prescribed a "more aggressive form of treatment."  (*Id.* at 15).  According to the

13   Commissioner, "[w]ithout more, Plaintiff fails to demonstrate that his condition

14   deteriorated so much that the ALJ was required to include additional restrictions in the

15   RFC or develop the record further."  (*Id.* at 15-16).  As such, the Commissioner maintains

16   that the record reviewed by the ALJ was "neither inadequate [n]or incomplete."  (*Id.* at

17   16).

18

19        "Social Security proceedings are inquisitorial rather than adversarial.  It is the

20   ALJ's duty to investigate the facts and develop the arguments both for and against

21   granting benefits[.]"  *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).   The ALJ has an

22   affirmative duty to assist the claimant in developing the record "when there is ambiguous

23   evidence or when the record is inadequate to allow for proper evaluation of the evidence."

24   *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *see also Brown v. Heckler*,

25   713 F.2d 441, 443 (9th Cir. 1983) (per curiam ) ("In Social Security cases the ALJ has a

26   special duty to fully and fairly develop the record and to assure that the claimant's

27   _____

28   [20] The ALJ's decision also refers to the March 15, 2018 MRI, stating:  "A March 15, 2018
     MRI of the right shoulder reports moderate to severe degenerative changes of the
     acromioclavicular joint, but no indication of any tears."  (AR 34).

1    interests are considered.  This duty exists even when the claimant is represented by

2    counsel.")  (citation omitted).  At the same time, "the ALJ is the final arbiter with respect

3    to resolving ambiguities in the medical evidence."  *Tommasetti v. Astrue*, 533 F.3d 1035,

4    1041 (9th Cir. 2008).  In reaching a conclusion, the ALJ must consider "conflicting

5    evidence and opinion testimony" in the record.  *Magallanes v. Bowen*, 881 F.2d 747, 753

6    (9th Cir. 1989)  However, "'[i]t is not necessary to agree with everything an expert

7    witness says in order to hold that his testimony contains 'substantial evidence.'"  *Id.*

8    (quoting *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988)).

9

10       An expert's opinion may be of limited value and fail to provide substantial

11   evidence where it fails to take into account key record evidence.  In *Hayes v. Astrue*, 270

12   F. App'x 502 (9th Cir. 2008), for example, the Ninth Circuit concluded that the ALJ's

13   heavy reliance on an examining physician's opinion was not supported by substantial

14   evidence where the physician's opinion did not consider readily-available results of the

15   claimant's nerve conduction study.  *Id.* at 504.  Similarly, in *Catalano v. Astrue*, 2013 WL

16   12100705 (S.D. Cal. Sept. 10, 2013), the court emphasized the "limited value" of medical

17   opinions rendered by reviewing physicians who did not consider claimant's complaints of

18   pain.  *Id.* at *3.

19

20       Furthermore, where a medical expert fails to opine on potentially critical data, the

21   omission may not as a general matter be rectified by the ALJ's independent consideration

22   of raw medical data.  It is widely acknowledged, as Plaintiff argues, that an ALJ may not

23   substitute his or her lay interpretation of raw medical data in making an RFC assessment

24   in lieu of a qualified expert's medical opinion.  *See, e.g.*, *See Penny v. Sullivan*, 2 F.3d

25   953, 958 (9th Cir. 1993) ("Without a personal medical evaluation it is almost impossible

26   to assess the residual functional capacity of any individual."); *Banks v. Barnhart*, 434 F.

27   Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own

28   judgment for competent medical opinion . . . and . . . must not succumb to the temptation

17

to play doctor and make . . . independent medical findings.") (quotations omitted); *Tagger v. Astrue*, 536 F. Supp. 2d 1170, 1181 (C.D. Cal. 2008) ("[An] ALJ's determination or finding must be supported by medical evidence, particularly the opinion of a treating or an examining physician.") (citations and internal quotation marks omitted); *Brawders v. Astrue*, 793 F. Supp. 2d 485, 493 (D. Mass. 2011) ("'[W]here an ALJ reaches conclusions about [a] claimant's physical exertional capacity without any assessment of residual functional capacity by a physician, the ALJ's conclusions are not supported by substantial evidence and it is necessary to remand for the taking of further functional evidence.'") (quoting *Perez v. Sec. of Health and Human Servs.*, 958 F.2d 445, 446 (1st Cir. 1999)). While some courts have found that "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment," where "a claimant has sufficiently put her functional inability to perform her prior work in issue . . . 'an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person.'" *Manso-Pizarro v. Sec. of Health and Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) (quoting *Santiago v. Sec. of Health and Human Servs.*, 944 F.2d 1, 5 (1st Cir. 1991)).

For example, in *Flores v. Colvin*, 2017 WL 367408 (C.D. Cal. Jan. 24, 2017), objective evidence suggesting that the plaintiff's degenerative disc disease had worsened emerged after the examining and non-examining physicians issued their assessments and therefore could not have been considered by them. The tests included two CT scans, radiographic imaging, and an MRI. *Id.* at *4. The ALJ adjusted the RFCs assessed by the examining and non-examining physicians to reflect the ALJ's interpretation of the new evidence. *Id.* at *5. The court concluded that the ALJ's adjustment of the RFC based on raw medical data that was not considered by any medical expert was an improper substitution of the ALJ's lay opinion for a medical opinion, and remanded for further consideration of the evidence developed after the prior RFC assessments issued. *Id.* at *6.

1      Here, the x-ray, bone scan and MRIs of Plaintiff's spine, shoulders and feet that

2  Plaintiff contends show his condition deteriorated[21] were taken in 2017 and 2018, after

3  Dr. Vaghaiwalla and Dr. Han completed their reviews.  Although the images were taken

4  before Dr. Payne conducted his examination of Plaintiff, it is not at all clear from

5  Dr. Payne's opinion that he considered them because the *only* objective imaging evidence

6  that he specifically refers to is a 2016 x-ray of Plaintiff's feet.  (AR 1148).  As such, the

7  Court cannot say with confidence that Dr. Payne's RFC provided the ALJ with substantial

8  evidence of Plaintiff's actual capabilities because it does not appear to have taken into

9  account objective imaging evidence that could potentially confirm or refute Plaintiff's

10  complaints.

11

12      While the ALJ attempted to incorporate some of the imaging evidence into her

13  decision and adjusted Plaintiff's RFC accordingly, the ALJ is not a trained physician and

14  is not qualified to opine on the meaning of raw medical data.[22]  As Plaintiff argues, the

15  ALJ could have developed expert opinion on the import of the imaging evidence -- or lack

16  thereof -- by ordering an updated consultative examination, *see* 20 C.F.R. § 404.1517, by

17  calling a medical expert to testify at the hearing, 20 C.F.R. §§ 404.1519, 404.1519a, or by

18  remanding the matter back to the "appropriate component" of the agency to make a new

19  determination based on the subsequent medical evidence.  20 C.F.R. § 416.1448(c)(1).  It

20

21  [21] Plaintiff stated at the August 14, 2018 hearing that he suffers from constant low back pain (AR 57-58); a left knee ACL injury (AR 58); elbow tendinitis with hand numbness (AR 61); and shoulder problems, including surgery in 2010 on his left shoulder and right

22  shoulder pain for which he required treatment.  (AR 63-64).  Plaintiff stated that his back gets stiff and he has to wait to get out of the car.  (AR 60).  He can grip things for only

23  four to five minutes before his hands get stuck in a fist, (AR 60-61), and he uses wrist braces for carpal tunnel syndrome.  (AR 63).  He claimed that he can carry ten to twenty

24  pounds, (AR 64-65), but not anything heavy in front of him (AR 62); he has trouble reaching overhead, (AR 64); can walk for ten to fifteen minutes at a time (AR 58, 65); and

25  can sit for five to ten minutes at a time.  (AR 65).  His doctor told him to use a cane, but he does not want to.  (AR 66).  His doctor also told him in 2017 that he needs a knee

26  replacement.  (AR 58).

27  [22] The ALJ's RFC differs from Dr. Payne's in that the ALJ concluded that Plaintiff could kneel, crawl, climb, balance, and lift overhead with his right shoulder only occasionally,

28  (AR 29), whereas Dr. Payne concluded that Plaintiff could perform these tasks frequently. (AR 1153).

1    may well be that the Commissioner is correct that the imaging evidence does not show

2    deterioration of Plaintiff's condition severe enough to alter the ALJ's RFC.  However, in

3    the absence of a medical opinion explaining the meaning of the imaging evidence, the

4    current record is not sufficiently developed for the Court to find that the ALJ's decision

5    was supported by substantial evidence.

6

7        The matter is remanded for further proceedings.  On remand, the ALJ shall

8    reevaluate Plaintiff's RFC, taking into account the full range of medical evidence,

9    including the 2017 and 2018 objective imaging evidence, as informed by medical opinion.

10

11                          **IV.**

12                    **CONCLUSION**

13

14        Accordingly, IT IS ORDERED that Judgment be entered REVERSING the

15    decision of the Commissioner and REMANDING this matter for further proceedings

16    consistent with this decision.  IT IS FURTHER ORDERED that the Clerk of the Court

17    serve copies of this Order and the Judgment on counsel for both parties.

18

19    DATED:  November 25, 2020

20

21

22                          PEDRO V. CASTILLO
                         UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28